2023 IL App (1st) 191122-U

No. 1-19-1122

Order filed November 22, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| MARZIE BASTANI, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner-Appellant, | ) | Decision of the Human Rights |
| | ) | Commission |
| v. | ) | |
| | ) | |
| THE HUMAN RIGHTS COMMISSION, THE | ) | Charge No. 2015 CH 199 |
| DEPARTMENT OF HUMAN RIGHTS, 55 W. ERIE | ) | |
| ASSOCIATION, and PHOENIX RISING | ) | |
| MANAGEMENT GROUP, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the decision of the Human Rights Commission sustaining the Department of Human Rights' dismissal of petitioner's charge of housing discrimination for a lack of substantial evidence.

¶ 2    Petitioner Marzie Bastani appeals *pro se* from the decision of the Human Rights Commission (Commission) sustaining the dismissal by the Department of Human Rights

(Department) of her claim under the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2014)) against respondents 55 W. Erie Association (Erie or Association) and Phoenix Rising Management Group (Phoenix).[1] On appeal, petitioner contends that the Commission erred in sustaining the Department's dismissal of her charge because the Department mishandled its investigation of the claims in her charge and the claims were meritorious. For the foregoing reasons, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4      In mid-2014, petitioner brought a charge before the Department against Erie and Phoenix, the condominium association and management company, respectively, for the building where she resided. She alleged that Erie and Phoenix altered the terms, conditions, or privileges of her real estate transaction because of her Middle Eastern national origin or ancestry, in violation of Section 3-102(B) of the Act. *Id.* § 3-102(B). Specifically, she alleged that they "refused to fix water damage to her interior walls as a result of a leaking downspout" while they "paid to repair water damage to non-Middle Eastern resident Tony Marengo" and other unit owners. She also alleged that they "refused to reimburse her for flowers and other garden supplies she purchased for the common areas" while they "reimbursed other non-Middle Eastern unit owners for purchases they made for the common areas." Lastly, she alleged that they refused to allow her to participate in board meetings and failed to include her requests made at the board meeting in the minutes, while they "allowed non-Middle Eastern unit owners to participate in board meetings and included their requests in the minutes."

---

[1] While petitioner is referred to frequently in the record as Marzi Bastani, she gives her name on her *pro se* petition for review as Marzie Bastani.

¶ 5    The Department investigated petitioner's claims. It was uncontested that petitioner is of Middle Eastern ancestry, but the Department found that she was not the only unit owner of Middle Eastern ancestry in the Association and the other Middle Eastern unit owner was not discriminated against.

¶ 6    It was uncontested that there was damage to the interior of petitioner's unit, and that she made a claim to respondents that they should be responsible for repairing that damage because the water infiltration to the interior of her unit resulted from a leaky exterior downspout. However, respondents disputed that petitioner was entitled under Erie's bylaws to have repairs to the interior of her unit paid for by respondents. Specifically, respondents asked their legal counsel about their liability, and were advised that Erie was not responsible under its bylaws for any damage to the interior of a unit regardless of the source or cause. Respondents provided copies of Erie's bylaws and the October 2013 letter from respondents' counsel.

¶ 7    Petitioner pointed to the repair, five years before her damage, of interior water damage from a leaky roof to the unit of Tony Marengo, president of Erie's board. Neither Erie nor Marengo contested that Erie paid for the repair work to Marengo's unit, but Erie maintained that it did not have a management company back then and acted informally without legal advice. Specifically, Erie did not know then that its bylaws exempted it from liability for unit owners' interior damage. While petitioner's charge alleged that respondents paid for repairs to the interiors of non-Middle Eastern unit owners who suffered damage from the leaky downspout, Erie's former board president Tonya Gill attested that no other units were damaged by the leaky downspout and no other unit owners made damage claims.

¶ 8    Regarding the claim of failure to reimburse, it was uncontested that petitioner as a unit owner was entitled to reimbursement of approved expenditures for the common areas of the building and that petitioner made such an approved expenditure for the common areas, specifically, for outdoor plants. However, the Department noted, petitioner admitted that she was reimbursed for those expenditures, and a December 2013 check issued by Erie matched the sum of July 2013 receipts provided by petitioner. Moreover, Lema Korshid, the other unit owner of Middle Eastern ancestry, stated in an interview that respondents timely reimbursed her for a purchase she made for the common areas.

¶ 9    Lastly, petitioner claimed that she was not allowed full participation at Erie's board meetings because her requests for repairs were not included in the meeting minutes and board members whispered about her. However, Gill and Marengo denied that petitioner was discriminated against in board meetings, asserting that "the only reason her requests for repairs were not noted in the board meeting minutes" was because the board had already determined on advice of counsel that Erie was not responsible for petitioner's water damage and had already informed her of the board's decision. Also, petitioner was offered to have the board minutes amended to reflect her repair request but she "failed to ask that the minutes be amended." Gill and Marengo also "denied that they or any other board members whispered about her at the board meetings, or made any comments about [her] ancestry," while petitioner "admitted that she was not able to identify any board members or condo association members at large who whispered about her, nor was she able to articulate any comments such persons whispered about her related to her national origin or ancestry."

¶ 10    The Department initially dismissed petitioner's charge for lack of substantial evidence in 2015. In August 2015, petitioner requested that the Commission review the dismissal. In September 2015, the Department agreed that further investigation was needed. Specifically, the Department would have to determine whether Erie and Phoenix's "articulated reasons for refusing to fix water damage to [petitioner's] unit, failing to reimburse [her] for expenses for the common area in a timely manner, and for refusing to allow [her] to raise her complaint at a board meeting was pretext for unlawful discrimination." Noting that the Department was not contesting petitioner's appeal, the Commission vacated the dismissal and remanded to the Department for further investigation.

¶ 11    The Department conducted a further investigation. In an interview, Gill stated that petitioner complained in 2013 of water inside her unit from a leaky downspout seeping through the brick wall. When water was found inside petitioner's unit and the unit owned by Tiago Mexia, Erie hired a contractor who tuckpointed the building exterior. However, two contractors examined petitioner's unit and opined, after finding the interior bricks to be moist, that the interior should not be tuckpointed after the exterior was tuckpointed because that would merely trap water in the bricks. Petitioner disputed that assessment, and Gill acknowledged telling her "initially" that the Association would pay for tuckpointing if it was needed. However, Erie's board adopted the position on advice of counsel that Erie was not responsible for damage to the interior of units regardless of cause. Petitioner had been told of the board's decision in October 2013, and Gill denied telling petitioner that her claim was approved.

¶ 12    Petitioner opined in an interview that the interiors of Mexia's unit and Gill's unit were repaired at Association expense. Mexia stated in an interview that he had water infiltration in his

unit in 2013 at the same time petitioner did, but he had no interior work done on his unit and the Association did not pay for any work to the interior of his unit. Mexia said that an exterior tuckpointing contractor also gave estimates for interior work to be done at unit owner expense. Gill stated in her interview that she had a contractor examine her unit to get an estimate for interior work, at her own expense rather than the Association's, but the estimate was too high and she tuckpointed her own interior wall. A tuckpointing contractor stated in an interview that his firm did not perform any interior work at the Association's building. It had provided estimates for interior repairs to be paid by individual unit owners, but Gill and Mexia declined to have his firm perform interior work.

¶ 13    Regarding the reimbursement claim, petitioner stated in an interview that, in July 2013, she asked Marengo and someone from Phoenix for reimbursement for the plants she purchased for the common areas but Marengo refused. Petitioner said she later sent a letter to respondents' counsel, but she did not provide a copy to the Department. Marengo stated in an interview that he did not recall such a conversation with petitioner. Gill stated in an interview that Erie did not approve petitioner's plant purchase beforehand, petitioner did not ask Gill for reimbursement until December 2013, and Gill then told Phoenix to pay petitioner.

¶ 14    Regarding the board minutes claim, petitioner stated in an interview that Erie's board did not address her water damage claim in its August 2013 and May 2014 meetings nor did the meeting minutes reflect her claim. Marengo stated in an interview that he sent petitioner an email after the August 2013 meeting stating that the board could vote on any notes or additions to the minutes that she would submit. A copy of that email was provided to the Department. Gill stated in an interview that the board did not consider her claim in its meeting because it had already concluded

it did not have to pay, and informed petitioner of that decision. Gill also said that the May 2014 board meeting was postponed to June, and petitioner did not attend the June 2014 meeting (minutes of the June 2014 meeting did not reflect petitioner's attendance). Petitioner acknowledged in an interview that she learned in October 2013 of the Erie board's decision to not pay for interior repairs, but maintained that the board did not specifically reference her claim.

¶ 15    In June 2016, following the additional investigation, the Department again dismissed petitioner's charge for lack of substantial evidence.

¶ 16    Petitioner filed a request that the Commission review the dismissal, alleging that the Department investigator was impatient, upset with her, and stated "your country prosecute[s] Christians." She further alleged that the Department did not properly keep in contact with her. The Department responded to her request for review, stating the investigation did not show that respondents treated her differently than other unit owners because she was of Middle Eastern ancestry. The Department averred that its investigation was thorough, and petitioner's request for review did not provide additional evidence addressing the substantive claims of discrimination. Through counsel, petitioner replied in support of her request for review, claiming that she did not receive a copy of respondents' response to her charge or the Department's response to her request for review, and alleging that she attended a case conference without counsel because counsel was not properly notified of the meeting. Despite her contention that she never received the Department's response, petitioner replied to several points in the Department's response. Petitioner also provided documents showing estimates for internal repairs to her unit and Mexia's unit, and she maintained that Mexia's unit was repaired while hers was not.

¶ 17    On April 29, 2019, the Commission sustained the Department's decision, reciting that it "reviewed all pleadings filed," and finding that the Department properly dismissed petitioner's charge for lack of substantial evidence. The Commission expressly found that petitioner's request for review did "not provide any evidence that would warrant a different outcome."

¶ 18    The Commission acknowledged that Erie "repaired the leaky downspout and tuck-pointed areas of exterior brick but declined to pay for repairs to [petitioner's] unit," but found no substantial evidence of discrimination for the failure to pay. While Erie paid for repairs of a non-Middle Eastern unit owner following a roof leak five years before petitioner's unit was damaged, Erie's "current" bylaws "clearly stated that repairs to the interior portions of units were not the Association's responsibility," the Commission noted. Erie attributed that earlier payment to acting informally without advice of counsel or a management company such as Phoenix prior to determining whether it was obligated to pay for the repair. While petitioner claimed "that the other affected owners' repairs were paid for," the Commission found that "she failed to establish any evidence to support her claim," and the Department "investigation indicated that neither of the other two unit owners whose units were damaged were reimbursed for any repairs."

¶ 19    As to petitioner's claim "that the Association and Phoenix failed to reimburse her for $85.53 in plant purchases she made for common areas," the Commission found the claim also failed. It found that although petitioner's "request was initially denied because she had not requested prior approval for her purchases, she was eventually reimbursed." The Commission found "no evidence whatsoever that the delay was in any way related to [her] ancestry."

¶ 20    Lastly, the Commission found petitioner failed to establish substantial evidence "that her participation in the August 2013 Association board meeting was limited by the Association [and]

Phoenix *** because her request for reimbursement for the repair of her interior walls was not reflected in the Association's minutes." However, Erie and Phoenix claimed "that the request was not included in the minutes because it had already been addressed." They also claimed that petitioner did not follow up on their "offer to amend the meeting minutes" at her request.

¶ 21    The Commission concluded that petitioner had "not presented any evidence to show that the *** dismissal of the charge was not in accordance with the Act." This appeal timely followed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, petitioner contends that the Commission erred in sustaining the Department's dismissal of her charge because the claims in her charge were meritorious. She also reiterates the allegations of mistreatment by the Department that she raised in her appeal to the Commission.

¶ 24    The Act provides that it is a civil rights violation for any person, based on unlawful discrimination, to "[a]lter the terms, conditions or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith." 775 ILCS 5/3-102(B) (West 2014). A petitioner alleging a violation of the Act has the initial burden to prove a *prima facie* case of unlawful discrimination by a preponderance of the evidence. *Spencer v. Human Rights Comm'n*, 2021 IL App (1st) 170026, ¶ 33. Unlawful discrimination includes discrimination based on race, religion, national origin, and ancestry. 775 ILCS 5/1-103(Q) (West 2014).

¶ 25    If the petitioner establishes a *prima facie* case, a respondent can rebut it by giving a legitimate nondiscriminatory reason for his or her actions. *Spencer*, 2021 IL App (1st) 170026, ¶ 33. The burden then shifts back to the petitioner to prove by a preponderance of the evidence that the respondent's reason was untrue and a pretext for discrimination. *Id.* It is essential to a discrimination claim that the petitioner or complainant prove that adverse treatment by a

respondent was "motivated by the complainant's membership in a protected class." (Internal quotation omitted.) *Id.* ¶ 37.

¶ 26    When a discrimination charge is filed, the Department must conduct a "full investigation" of the charge's allegations and prepare a written report. 775 ILCS 5/7B-102(C), (D) (West 2014). The Director of the Department must review the report to determine whether there is "substantial evidence" that the alleged discrimination occurred. *Id.* § 7B-102(D)(2). If the Director determines there is no substantial evidence to support the charge, it is dismissed. *Id.* § 7B-102(D)(2)(a).

¶ 27    A petitioner may then, as petitioner did here, request the Commission review that dismissal. *Id.* "When a request for review is properly filed, the Commission may consider the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by the Department in response to the request." *Id.* § 8-103(B). "[T]he Commission's function is to review the Department's factual findings and determine whether there is enough evidence to support the filing of a charge," and "the Commission must adopt the Department's factual findings unless they are against the manifest weight of the evidence." *Truger v. Department of Human Rights*, 293 Ill. App. 3d 851, 858 (1997). If the Commission sustains the dismissal, the petitioner may seek review in the appellate court. 775 ILCS 5/8-111(B)(1) (West 2014).

¶ 28    We review the decision of the Commission, rather than that of the Department. *Alcequeire v. Human Rights Comm'n*, 292 Ill. App. 3d 515, 519 (1997). The Commission's findings of fact are entitled to deference and "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-111(B)(2) (West 2014). "The determination of whether [a respondent's] articulated reason is pretextual is a question of fact."

*Spencer*, 2021 IL App (1st) 170026, ¶ 33. The Commission's ultimate decision to sustain the dismissal of a charge will be reversed only if the decision constitutes an abuse of discretion. *Id.* ¶ 32. An abuse of discretion exists if no reasonable person could agree with the Commission's decision. *Id.* We cannot reweigh the evidence or substitute our judgment for the Commission's in making that determination. *Id.* We also must limit our review to the evidence and issues presented to the Commission. *Id.* ¶ 42.

¶ 29    Here, after reviewing the record, we conclude petitioner has failed to demonstrate that the Commission abused its discretion by sustaining the dismissal of her charge for lack of substantial evidence.

¶ 30    The Commission's conclusion that respondents provided a plausible explanation for not repairing damage to the interior of petitioner's unit though another unit was repaired earlier was not against the manifest weight of the evidence. Although the earlier repair, and any repair of petitioner's unit, was directly contrary to Erie's bylaws, the other unit was fixed before Erie had professional management and advice of counsel regarding whether it was obligated to make repairs. While there was evidence Erie rejected petitioner's repair claim before its counsel opined that it was not obligated to pay, Gill explained that contractors had examined the interior of petitioner's unit and reported that interior tuckpointing would merely trap the seepage in the wall.

¶ 31    Petitioner maintains that the interior of Mexia's unit was repaired while hers was not. However, the existence of estimates for interior repairs does not contradict the evidence the Department gathered or the conclusions the Commission reached. Mexia and Gill stated in interviews that they received estimates for interior work to be done at unit owner expense but declined the work, and a tuckpointing contractor corroborated their accounts. It was not against

the manifest weight of the evidence for the Commission to find that, contrary to petitioner's assertion, two unit owners did not have interior water damage repaired at Association expense.

¶ 32    The Commission's conclusion that petitioner was reimbursed for her expenditures for plants for the common areas, and that any delay in reimbursement was not related to petitioner's ancestry, was also not against the manifest weight of the evidence. Specifically, there was conflicting evidence from petitioner and Marengo as to whether petitioner sought reimbursement in July 2013 shortly after her purchase. Gill said she did not receive petitioner's request until December 2013, shortly before she was paid, indicating there was no delay in reimbursement. Also, the other Erie unit owner of Middle Eastern ancestry had no issues with her reimbursement.

¶ 33    Lastly, the Commission's conclusion that petitioner's repair claim was not included in the board minutes because the claim had already been denied and petitioner did not request an amendment of the minutes was not against the manifest weight of the evidence. Gill and Marengo testified to that effect and Erie submitted an email showing that petitioner was informed that the minutes could be amended at her request. In sum, we find the Commission's conclusions were not against the manifest weight of the considerable evidence the Department investigations gathered, as set forth above. *Supra* ¶¶ 5-15.

¶ 34    That conclusion is not changed by petitioner's contention here, as before the Commission, that the Department's investigation of her claims was improper. As stated above, the focus of the Commission's review is whether there was enough evidence to sustain a charge. *Supra* ¶ 27. Moreover, the Commission must adopt the Department's factual findings, and we must accept the Commission's factual findings, unless they are against the manifest weight of the evidence. *Supra* ¶¶ 27-28. The Commission did not expressly address petitioner's claims regarding the

investigation, but it did recite that it reviewed the pleadings before it, and it found that petitioner did not provide any new evidence warranting a different outcome.

¶ 35　We find the Commission's conclusion was not an abuse of discretion. The alleged improprieties by the Department would not change (1) Erie's bylaws or the letter from its counsel advising that it had no obligation to pay for repairs to unit interiors; (2) the interviews of Mexia and Gill, in which they stated they obtained estimates for interior work at their own expense and then did not hire the contractor, nor the contractor's corroboration of their accounts; (3) the interview of Korshid, the other unit owner of Middle Eastern ancestry, that respondents timely reimbursed her for an approved purchase she made for the common areas; or (4) the email notifying petitioner that she could request an amendment of the Erie board's meeting minutes. We also find that addressing petitioner's allegations of an improper investigation would not change that petitioner had the burden of showing first the Department and then the Commission that Erie and Phoenix treated her differently than other unit owners based on her Middle Eastern ancestry, and that she failed to present sufficient evidence of this proposition before either body.

¶ 36　　　　　　　　　　　III. CONCLUSION

¶ 37　Accordingly, we affirm the decision of the Commission.

¶ 38　Commission decision affirmed.